UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

19900 W Nine Mile, LLC,

      Plaintiff,                           Case No. 20-10677

v.                                    Hon. Denise Page Hood

THE HANOVER INS. CO.,

      Defendant.

_____/

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT [ECF No. 21] and DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT [ECF No. 23]**

## I.    INTRODUCTION

This breach of contract case stems from three claims Plaintiff submitted to Defendant pursuant to a policy of commercial property insurance (the "Policy"). The claims arose from two separate water losses and a fire loss at Plaintiff's commercial building at 19900 W. Nine Mile Road in Southfield (the "Building"), that occurred in February and March 2019.   Plaintiff filed a Motion for Summary Judgment on July 23, 2021 [ECF No. 21], and Defendant filed a Motion for Summary Judgment on July 28, 2021. [ECF No. 23] The Motions have been briefed, and a hearing was held.

1

## II.    BACKGROUND

Plaintiff purchased the Building on October 2, 2018 for $3.5 million. As a condition of its purchase, Plaintiff was required to escrow $600,000 from its mortgage for planned capital improvements, including replacement of the roof, which had been described as "very old" when Plaintiff bought the Building.  The Building's anchor tenant, Specs Howard School of Media Art ("Specs Howard"), leased approximately 65% of the available square footage in the Building.  In mid-November 2018, water leaks originating at the roof damaged the second-floor bathrooms and marketing room. Plaintiff hired a contractor who timely identified the source of the leaks and repaired them.  That damage is not pertinent to this case.

Following that leak, Plaintiff concluded it would be prudent to replace the roof as soon as possible, and Plaintiff's contractor obtained multiple bids soon thereafter. Plaintiff accepted a $151,000 bid on January 4, 2019 for the complete tear off and re-roofing of the Building.  Materials for the job were delivered on January 15, 2019, and the work began shortly thereafter. On January 23, 2019, while the replacement of the roof was in progress, an accumulation of ice and snow on the roof melted, causing interior water damage to the Building's second floor, including classrooms 201, 204, 205, 207; the Marketing room; the Entrance stairs; and the Fiber Optics

2

room. Plaintiff's contractor timely identified and repaired the source of the leaks. The January 23, 2019 damage is not at issue in this action.

### A.    Claim #1: February 4, 2019 Water Loss

On February 4, 2019, another freeze/thaw cycle melted 3" to 4" of accumulated ice and snow on the roof and a deluge of water entered the Building, reaching the first floor and causing significantly greater damage than had previously occurred. The interior water damage affected the same areas of second floor as the prior water intrusions: classrooms 201, 203, 204, 205, 206, 207 and 208.  Several first-floor offices and vending area, previously unaffected, were damaged.

Due to the extent of the damage, Plaintiff notified Defendant of the February 4, 2019 loss and its intent to make a claim. Plaintiff's representative, Jack Echterling ("Echterling"), submitted a Sworn Statement and Proof of Loss to Hanover Insurance Company dated June 24, 2019 that identified the cause of the loss as "weight of ice/snow." ECF No. 23, Ex. C at 1. The Proof of Loss sets forth the following figures:[1]

---

[1] Plaintiff retained Emergency Response Services to perform estimates with respect to the damages in this matter. A copy of the report and estimate from Emergency Response Services includes "an estimate for three claims and will need to be separated per occurrence." The report provides on page 267 for the following breakdown:

- Replacement Cost Value: $1,115,844.52;
- Less depreciation: $222,249.71;
- Actual cash value: $893,594.81;
- Less deductible: $5,000.00;
- Net claim: $888,594.81;
- Total recoverable depreciation: $222,249.71;

- Actual Cash Value:                           $144,011.09
- The Whole Loss and Damage:         $276,663.36
- Less Amount of Deductible:            $   5,000.00
- The Total Amount Claimed:            $271,663.36

Defendant hired Donan Engineering ("Donan") to inspect the roof and assess

the damage. Weather conditions prevented Donan's Engineer, Andrew Vane, P.E.

("Vane"), from inspecting the property until March 19, 2019. ECF No. 21, Ex. 10.

By that date, all but a small portion of the roof had been replaced, including the areas

where the February 4, 2019 water intrusion entered the building. *Id.* at 3-4.

Vane concluded that water from the rapid melting of ice and snow infiltrated

the building's interior through pre-existing pathways from age-related deterioration.

*Id.* at 11.  He found that:

- The building experienced a widespread water intrusion originating from the roof;
- The water intrusion was a recent one-time event;
- The water intrusion occurred on February 3 and February 4, during rapid melting of snow and ice on the roof;
- The cause of water intrusion is rapid melting of ice and snow, blocked roof dams, and pre-existing pathways for water entry through the roof membrane;
- The pre-existing pathways for water entry through the membrane resulted from age-related deterioration; and
- The damage to the EPDM membrane was not caused by snow, ice, hail, wind, or storm activity.

---

- Net claim if depreciation is recovered: $1,110,844.52.

Defendant retained Hexagon General Contractor's Services, LLC ("Hexagon") to evaluate the loss, and Hexagon concluded that the replacement cost value for the loss totaled $133,012.83.  Defendant initially confirmed coverage for the loss and issued $200,000 in advance payments on this first water damage claim. ECF No. 21, Ex. 11.  Defendant ultimately denied coverage for this loss, however, in correspondence dated February 11, 2020.  Defendant's denial was based on its investigation, review, evaluation, and analysis of the claim, and concluded that the loss was excluded under the "wear and tear exclusion" as well as the "faulty, inadequate, or defective maintenance" of the roof at issue in the claim.

### B.    Claim #2: March 25, 2019 Fire Loss

On March 25, 2019, the roofers caused a fire while using a torch. The fire damage was limited but smoke entered a nearby air intake vent and caused substantial damage throughout the Building. Due to the large amount of smoke damage, Specs Howard could not continue its operations in the Building.  Within days, Specs Howard arranged to relocate out of the Building to a different location because of the perceived health risk to its students. ECF No. 21, Ex. 12.

Plaintiff provided a sworn statement by Echtrling and Proof of Loss relative to the March 25, 2019 incident, with the following figures:

• Actual Cash Value: $895,594.81;
• The Whole Loss and Damage: $1,115,844.52;

• Less Amount of Deductible: $5,000.00; and
• The Amount Claimed: $1,110,844.52.

Defendant again retained Hexagon to evaluate the damages and prepare an estimate with respect to the fire loss, and Hexagon assessed the total replacement cost value for the March 25 fire loss at $35,836.80 (that does not include costs that would otherwise cover the impacted roof portions of the loss).

Emergency Response Services, Inc. performed an evaluation regarding the fire loss and estimated the replacement cost to be $146,230.91. Defendant issued payment with respect to this claim in the amount of $163,520.72 on October 31, 2019. Defendant issued a coverage opinion letter related to the March 25, 2019 fire loss on February 11, 2020, and it identified the payment of $163,520.72. The letter also outlines Defendant's coverage position that the facts do not support Plaintiff's claim that Specs Howard was required to vacate the property (or decided to vacate the property) as a specific result of the March 25, 2019 fire.

Plaintiff demanded an appraisal with respect to the fire loss. Based upon the Appraisal Award issued, the Appraisal Panel attributed 100% of the lost business income to the March 25, 2019 fire loss, at rate of $56,845.95/month from the date of loss through four months after Defendant made the actual cash value payment that was determined on the Building Appraisal Award Form. Defendant issued payment

to Plaintiff for the amounts identified on the Appraisal Award Form, as discussed below.

**C.   Claim #3: March 30, 2019 Water Loss**

On March 30, 2019, a clogged roof drain backed-up after a heavy rainstorm dropped 1.34" of rain, and a large volume of water entered the Building. A plumber who was called to the scene that day snaked the drain line and cleared the obstruction he encountered approximately 40 feet into the line. Once the blockage was cleared, the water leakage into the Building immediately subsided and the overflow of water on the roof drained away.  Defendant's water mitigation contractor, Speed Clean Services reported that "[t]he roofing systems sustained water intrusion from drains and sump pit backing up." ECF No. 21, Ex. 14.

As noted in Defendant's claim report, the interior water damage caused by this loss was in a distinctly different area of the Building than the damage caused by the February 4, 2019 water loss. The damage from the first loss was heaviest in the northwest area of the Building, and the damage from the second water loss was concentrated in the southeast area of the Building. ECF No. 21, Ex. 15.  Defendant's engineering expert (Vane) inspected this loss on April 10, 2019. ECF No. 21, Ex. 16. Vane reported that the purpose of his inspection was to determine the cause of the water intrusion and whether it was caused by faulty workmanship. *Id.* at 1.  Vane

7

concluded the water intrusion originated at three roof drain bowls, which he opined were improperly installed and/or sealed. *Id.* at 8. Vane confirmed at his deposition that he examined all the drain bowls throughout the roof, and they all exhibited the same improper installation. ECF No. 21, Ex. 17 at 164:1-10. It was determined that water only leaked into the Building at the drain bowls attached to the blocked drain line. ECF No. 21, Ex. 13.[2]

The location where there was extensive water intrusion was near the area where the roofers had been repairing the roof prior to the March 25, 2019 fire loss. Plaintiff's Proof of Loss states that the cause and origin of the loss was as the result of "weight of snow/water." The Proof of Loss also provides for the following figures:

- Actual Cash Value: $461,807.05;
- The Whole Loss and Damage: $625,799.76;
- Less Amount of Deductible: $5,000.00;
- The Amount Claimed: $620,799.76.

---

[2] Plaintiff again retained Emergency Response Services, Inc. to perform an estimate, and it produced the following numbers:
- Replacement Cost Value: $625,799.76;
- Less Depreciation: $163,992.71;
- Actual Cash Value: $461,807.05;
- Less Deductible: $5,000.00;
- Net Claim: $456,807.05;
- Total recoverable depreciation: $163,992.71;
- Net claim if depreciation is recovered: $620,799.76.

8

Defendant again retained Hexagon, which prepared an estimate that includes a Replacement Cost Value that totals $208,398.95.

On February 11, 2020, Defendant notified Plaintiff that Defendant was denying coverage because it believed the water came into the structure on or about March 30, 2019, through an opening left in place by the incomplete installation of the roofing. Defendant asserted that those openings were not caused by damage from a covered cause of loss to the roof, through which rain, snow, sleet, ice, sand or dust entered.  Defendant indicated that Plaintiff's claim was excluded under the "wear or tear" and/or "faulty, inadequate, or defective" exclusions of the Policy.

### D.    Plaintiff's Proofs of Loss and Appraisal

Defendant received proof of Plaintiff's business income losses no later than June 12, 2019 and proof of Plaintiff's building losses on June 24, 2019. ECF No. 21, Ex. 18 at 59, 61; Ex. 19 at 6; Ex. 20). Defendant never contested its liability for the fire loss, but it did not make any payment on the claim or advance additional funds until October 31, 2019, nearly five months later, for $163,520.72. ECF No. 21, Ex. 21.   Plaintiff demanded appraisal pursuant to Mich. Comp. Laws Ann. § 500.2833(1)(m) and the terms of the Policy to determine the amount of Plaintiff's losses. On April 2, 2020, the appraisal panel entered an award on the Business Income portion of Plaintiff's loss, which it attributed 100% to the March 25, 2019

fire loss. The award established a monthly income loss of $56,845.95 beginning on the date of the fire and continuing until four months after Defendant paid the actual cash value of the Building loss, which, at that time, had not yet been appraised. ECF No. 21, Ex. 25.   On August 27, 2020, the appraisal panel entered the following Building Appraisal Award for each loss:

|                | Actual Cash Value | Replacement Cost Value |
|----------------|-------------------|------------------------|
| Loss 1 (Water) | $ 442,764.41      | $ 572,618.39           |
| Loss 2 (Fire)  | $ 995,481.40      | $1,126,865.11          |
| Loss 3 (Water) | $ 496,861.69      | $ 654,071.24           |

ECF No. 21, Ex. 26.  Defendant tendered payment of the appraisal awards pertaining to the March 25, 2019 fire loss (totaling $1,509,112.00) on October 2, 2020, approximately 18 months after the fire.  Together with its October 31, 2019 payment, Defendant paid a total of $1,672.632.80 on Plaintiff's fire loss claim.

From the date of the fire until Defendant paid Plaintiff for the fire loss claim on October 2, 2020, including during the appraisal period, Plaintiff repeatedly asked for payments so that it could perform the necessary repairs to enable Specs Howard to occupy its rented space. ECF No. 21, Ex. 22. Plaintiff warned Defendant that continued delays in making payment would result in Specs Howard having to cancel its lease and permanently move elsewhere, causing a significant consequential loss beyond the Policy limits, for which Defendant would be liable. *Id.* Specs Howard ultimately did cancel its lease and relocate elsewhere. ECF No. 21, Ex. 23.

### E. Defendant's Denials of Plaintiff's Water Loss Claims

On February 11, 2020, Defendant formally denied coverage for Plaintiff's two water loss claims. Defendant relied on the Policy language's limited liability for water damage to the interior of the building and the policy's exclusions for wear and tear and for faulty maintenance. ECF No. 21, Ex. 24. Plaintiff contends that Defendant owes Plaintiff an additional $739,626.10 for the actual cash value appraisal awards pertaining to those claims ($939,626.10, less the $200,000 advanced payments = $739,626.10).

## III. LEGAL STANDARD

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c),

its opponent must do more than simply show that there is some metaphysical doubt

as to the material facts."  *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Summary judgment must be entered against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial.  In such a situation, there

can be "no genuine issue as to any material fact," since a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders

all other facts immaterial.  *Celotex Corp.*, 477 U.S. at 322-23.  A court must look to

the substantive law to identify which facts are material.  *Anderson*, 477 U.S. at 248.

## IV.    ANALYSIS

The Policy includes the following language:

### A. Covered Causes of Loss
When Special is shown in the Declarations, Covered Causes of
Loss means direct physical loss unless the loss is excluded or
limited in this policy.

There is no dispute that Special is shown in the Declarations of the Policy and that

Plaintiff's claims pursuant to the Policy are for direct physical loss to the Building.

Plaintiff argues that Defendant cannot identify significant probative evidence of a

genuine dispute of material fact that limitations or exclusions under the Policy apply

12

with respect to the two water losses. Defendant contends that, based on the opinions reached by Vane, it properly denied the February 6 and March 30, 2019 dates of loss. Defendant claims there was no coverage under the Policy for the two water losses because, due to the condition of the roof (beyond its useful life), the wear and tear exclusion and the defective maintenance exclusion applied. Defendant also contends that it issued payment for the covered claims under the Policy, such that there is no genuine issue of any material fact that needs to be submitted to a jury and summary judgment is appropriate.

It is well-established law that exclusionary clauses in insurance policies are strictly construed in favor of the insured. *Shelby Mut. Ins. Co. v. United States Fire Ins. Co.*, 12 Mich.App. 145, 149 (1968). Coverage under a policy is lost, however, if any exclusion within the policy applies to an insured's particular claims, *Fresard v. Michigan Millers Mut. Ins. Co.*, 414 Mich. 686, 694 (1982), though clear and specific exclusions must be given effect. An insurance company is not to be held liable for a risk it did not assume. *Kaczmarck v. La Perriere*, 337 Mich. 500, 506 (1953). Any clause in an insurance policy is valid as long as it is clear, unambiguous and not in contravention of public policy. *Raska v. Farm Bureau Mut. Ins. Co. of Michigan*, 412 Mich. 355, 361-362 (1982). Courts cannot create ambiguity where

none exists. *Edgar's Warehouse, Inc. v. United States Fidelity & Guaranty Co.*, 375 Mich. 598, 602 (1965).

### 1. *February 4, 2019 Water Loss*

As to the February 4, 2019 water loss, Defendant denied the claim because "the claims for property losses stemming from the February 6, 2019 [water loss] are not covered losses under the policy, as they are excluded under the 'wear or tear' and/or 'faulty, inadequate, or defective … maintenance' provisions of the policy." ECF No. 21, Ex. 24.  Defendant insists that it was clear based upon the testimony offered at the Examination Under Oath of Echterling, together with the discovery completed in this matter, that the roof at issue was beyond its useful life. ECF No. 23, Ex. B and D.  Defendant states that, by the time the February 6, 2019 loss occurred, Plaintiff was aware of the immediate need to replace the roof but did not timely do so.

Although Vane initially confirmed coverage for this loss, Defendant relies on Vane's subsequent conclusion that the February 4, 2019 water intrusion occurred because of unrepaired (defective maintenance), pre-existing openings caused by age-related deterioration (wear and tear).  Defendant concluded that: (a) the age-related deterioration of the roofing system caused pre-existing pathways for water to enter through the membrane; and (b) the damage to the EPDM membrane noted on the

14

February 6, 2019 date of loss was not caused by snow; ice; hail; wind; or storm activity (any of which may qualify as a covered loss).

The Court notes that Vane reached that conclusion even though he never saw the roof in its pre-loss condition (on site or in photographs) and had no knowledge of the prior repairs made in November 2018 and January 2019.  Vane did not inspect the roof until approximately 6 weeks after the loss occurred, at which time the roof was not in same condition because all but a small area had been replaced with new roofing materials.  When Vane drafted his report, the only information he possessed regarding the roof's condition on the date of loss was based on an interview with one of the roofers, looking at the small area of the roof that had not been replaced yet, and his evaluation of the interior water damage.  The one unrepaired area of the roof Vane did inspect was not located in the area where the February 4th water intrusion and damage occurred. ECF No. 21, Ex. 10 at 3.  Plaintiff contends that Vane's interview with the roofer was superficial, as there was only a general statement about the roof's condition and no specifics regarding the roof on the date of the loss or in the areas where the water intrusion occurred.

The Court notes that Vane testified that he had insufficient information to offer the opinion that water entered the Building through openings created by wear and tear versus openings resulting from faulty, inadequate or defective repairs/

maintenance, including never seeing the physical opening through which Plaintiff asserts water entered the Building. ECF No. 21, Ex. 17 at 38. Vane testified as follows:

> Q.     In this case you don't know whether the water in the northwest area of the roof on February 3rd and 4th entered through a failed or improper repair versus some preexisting opening, fair?
>
> A.     I don't have the information to know one way or the other.

*Id*.  For that reason, although Defendant has established that there is a genuine dispute of material fact whether water entered the Building's interior on February 4, 2019 through pre-existing pathways from unrepaired, age-related deterioration, it cannot establish as much as a matter of law.

Plaintiff argues that the faulty maintenance exclusion contains an exception for ensuing losses such that, as a matter of law, Defendant cannot meet its burden of proving the loss resulted from wear and tear/age-related deterioration (as opposed to faulty maintenance or another non-excluded cause). In its February 11, 2020 denial letter, Defendant asserted the following policy Limitation as a basis for its claim denial:

> 4.     Limitations
>
>   a.     We will not pay for loss of or damage to:
> * * *
>     (3)    The interior of any building or structure, or to personal property in the building or structure,

16

> caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:
>
> \* \* \*
>
> (b)     The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

ECF No. 21, Ex. 27. The Court notes that this Limitation expressly covers interior water damage caused by or resulting from the thawing of snow and ice on the roof or other portion of the structure. As it is undisputed the February 4, 2019 interior water damage was caused by or resulted from the melting of ice and snow on the roof, the Court finds this Policy limitation does not preclude coverage for the loss.

Plaintiff next asserts that the exclusions for "wear and tear" and "faulty, inadequate, or defective maintenance of the roof," upon which Defendant relies, contain an exception for resulting or ensuing damage:

> 3.     We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.
>
> \* \* \*
>
> c.     Faulty, inadequate or defective:
>
> \* \* \*
>
> (4)     Maintenance;
> of part or all of any property on or off the described premises.

ECF No. 21, Ex. 27.

The Court finds that the interior water damage caused by or resulting from ice and snow melt is an expressly Covered Cause of Loss even if it entered the Building through openings caused by or resulting from faulty, inadequate or defective maintenance.  Such damage (the interior water damage from snow melt only, not repairs to the roof) would constitute a "resulting loss" covered under the Policy. Citing *Walters Beach Condo. Ass'n v. Home-Owners Ins. Co.*, No. 335172, 2017 WL 5503789 (Mich. Ct. App. Nov. 16, 2017) ("The plain language of this provision requires, as defendant concedes, that damage sustained due to a covered cause of loss, such as wind-driven rain, is covered under the policy even though the damage was also a result of a construction defect. What is not covered under Section B.3.c.(2) is the actual construction defect itself."); *Feinbloom v. Am. Int'l Ins. Co.*, No. 276928, 2008 WL 1836563, at *3 (Mich. Ct. App. Apr. 24, 2008).

For the foregoing reasons, the Court grants Plaintiff's motion for summary judgment, and denies Defendant's motion for summary judgment, with respect to the February 4, 2019 water loss.

### 2.  March 20, 2019 Water Loss

The Policy includes a "Gold Property Broadening Endorsement" purchased by Plaintiff, and it provides:

46.    Sewer Backup

> The following is added to A. Coverage, Paragraph 4. Additional Coverages of Building and Personal Property Coverage Form CP 00 10:
>
> Sewer Backup
>
> (1)   We will pay for direct physical loss or damage to Covered Property at the described premises, solely caused by or resulting from water or waterborne material carried or moved by water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment.  The term drain includes a roof drain and its related fixtures.

In its briefing, Defendant attributes the March 30, 2019 water intrusion to faulty, inadequate or defective workmanship and design, not any blocked drain line(s).

Plaintiff counters that the evidence uniformly identifies roof drain backups as the reason for the water damage on March 30, 2019.  Plaintiff states that its contractor, Detroit Renovations, confirmed in an email to Plaintiff's representative the day after the loss that the leak resulted from a clogged drain line that backed-up at two of the roof's numerous drains. ECF No. 21, Ex. 13.  A report from A&Z Roofing also confirmed the interior leak resulted from the backup of a clogged drain line. ECF No. 21, Ex. 30.  Defendant's contractor, Speed Clean Services found that "[t]he roofing systems sustained water intrusion from drains and sump pit backing up." ECF No. 21, Ex. 14.  Vane indicated that the blockage of the pipes was a "contributing" factor resulting in the backup of water on the roof around the drains connected to the blocked drain line. ECF No. 21, Ex. 17 at 147.

Plaintiff argues that Defendant's position that the water intrusion was due to faulty workmanship and design cannot be reconciled with the fact that water leaked into the Building only at roof drain bowls connected to the blocked drain line. Plaintiff cites the observation by Vane that the same installation deficiencies existed at all of the roof's drains. ECF No. 21, Ex. 17 at 163-64.

Plaintiff contends that this all of this circumstantial evidence indisputably establishes the blocked drain line and resulting backup and overflow of the drain line caused the water intrusion.  Plaintiff argues that those circumstances were expressly covered under the sewer backup language of the Policy's Gold Property Broadening Endorsement. The Court agrees.  The Court concludes that there is no genuine dispute of material fact concerning the cause of, and that Plaintiff has established as a matter of law Defendant's liability for, the March 30, 2019 water loss. Accordingly, the Court grants Plaintiff's motion for summary judgment and denies Defendant's motion for summary judgment on this issue.

### 3.  March 25, 2019 Fire Loss

Plaintiff asserts that Defendant breached the Policy by failing to make payment within 30 days of receiving proof of the amount of the loss on Plaintiff's claim arising from the March 25, 2019 fire loss.  It is undisputed that Defendant paid Plaintiff $163,520.72 on October 31, 2019.  Then, after being compelled by statutory

appraisal to do so, Defendant issued additional payments on the fire loss totaling $1,509,112.00, on or about October 2, 2020. Plaintiff contends that, because of Defendant's undue delay, the total payment was over $500,000 less than Plaintiff's business income loss, which extended for a period of 21 months. Plaintiff argues that, because the insurance policy has limits on the business income coverage for only the first 12 months of Plaintiff's loss, Defendant was not contractually required to pay the remaining $511,613.55 of Plaintiff's business income loss. (9 months at $56,845.95 per month = $511,613.55.) Had Defendant timely paid Plaintiff's fire loss claim, however, for which Defendant conceded coverage, Plaintiff maintains that it could have completed repairs and moved Specs Howard back into the Building within a year of the fire.

To prevail on its claim for breach of contract, Plaintiff must establish by a preponderance of the evidence that (1) there was a contract, (2) Defendant breached the contract, and (3) the breach resulted in damages to Plaintiff. *See, e.g., Dunn v. Bennett*, 303 Mich. App. 767, 774 (2013). The first element is not in dispute. Plaintiff contends Defendant breached the contract by failing to make timely payment on Plaintiff's fire loss claim because insurers are required by statute to pay a Michigan insured's claim within 30 days after receipt of proof of the amount of the loss. *See* M.C.L.A. § 500.2836(2) ("Except as otherwise provided in section

2845, losses under any fire insurance policy shall be paid within 30 days after receipt of proof of the amount of the loss, notwithstanding the provisions of any contract or statute to the contrary."); M..C.L.A. § 500.2833(1)(p) ("Each fire insurance policy issued or delivered in this state shall contain the following provisions…Except as otherwise provided in section 2845, that the loss is payable within 30 days after receipt of proof of amount of loss.").

It is undisputed that Defendant received proof of the amount of Plaintiff's business income loss no later than June 12, 2019 and proof of Plaintiff's building losses on June 24, 2019. Plaintiff insists that Defendant was contractually obligated to make payment for those losses by July 24, 2019 at the latest but did not make any payment on Plaintiff's fire loss claim until October 31, 2019 (over 90 days late).

Plaintiff asserts that Defendant's breach (failure to timely pay) caused Plaintiff to suffer lost rental income beyond the 12-month period covered by the Policy, namely the lost rental income resulting from Specs Howard terminating its lease. *Kewin v. Massachusetts Mutual Life Ins. Co.*, 409 Mich. 401, 415 (1980) (insured may recover economic consequential damages for the insurer's breach, defined as those damages "that arise naturally from the breach or those that were in

contemplation of the parties at the time the contract was made.").[3]  The goal is to "place the non-breaching party in as good a position as if the contract had been fully performed." *Corl v. Huron Castings, Inc.*, 450 Mich. 620, 625 (1996).

The Sixth Circuit and Michigan Supreme Court have held that the policy limits do not restrict consequential damages claimed as a breach of the insurance contract. *Salamey*, 741 F.2d at 876-877; *Lawrence*, 445 Mich. at 10-11.  Plaintiff therefore insists that it is not limited to recovering lost business income to the 12-month period within the Policy.  As the *Salemy* court stated:

> This claim for lost profits is separate from the claims to enforce the insurance contract. The policy limits restrict the amount the insurer may have to pay in the performance of the contract, not the damages that are recoverable for its breach. ... Salamey here is seeking to collect damages for losses occasioned by Aetna's breach of contract in failing to pay Salamey's claim under the policy. The business interruption [limitation] clause is thus irrelevant to the measure of damages for breach of contract.

---

[3] *See also Lawrence v. Will Darrah & Associates, Inc.*, 445 Mich. 1, 6, 10-14 (1994) (an insured under an anti-theft policy issued on a commercial vehicle stated a prima facie claim for extra-contractual lost profits as consequential damages resulting from the insurer's failure to timely pay benefits permitting replacement of the stolen vehicle); *Wendt v. Auto–Owners Ins. Co.*, 156 Mich.App. 19, 27-29 (1986) (insured may recover lost profits as consequential damages for the insurer's breach of the policy); *Parmet Homes, Inc v Republic Ins. Co.*, 111 Mich.App. 140, 149-50 (1981) (recognizing rule that "[l]oss of profits which result from the breach may be considered in assessing damages"); *Salamey v. Aetna Casualty & Surety Co.*, 741 F.2d 874, 876-878 (6th Cir. 1984) (affirming jury verdict awarding lost profits beyond the policy period as the commercial insured's consequential damages resulting "naturally and directly" from the insurer's breach of the policy); *Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, 108 F.Supp.3d 543, 569-570 (E.D. Mich. 2015) (holding that commercial insured "is entitled to recover consequential damages caused by any extension of its business interruption that is determined to be due to the [insurer's] unreasonable refusal to authorize the proper payment due on its claim, as long as such damages 'were in the contemplation of the parties at the time the contract is formed'"); *Red Cedars Inc. v. Westchester Fire Ins. Co.*, 686 F.Supp. 614, 615-616 (E.D. Mich. 1988) (pursuant to Michigan law and *Salamey, supra*, the commercial insured may recover lost profits as consequential damages for the insurer's breach unrestricted by the limits of the policy).

23

*Salemey*, 741 F.2d at 877 (citation and internal quotation marks omitted); adopted in *Lawrence*, 445 Mich. at 11.

Plaintiff asserts that its continuing lost business income incurred after Defendant failed to timely pay Plaintiff's claim arises "naturally from the breach," *Kewin*, 409 Mich. at 415, as "the purpose of the contract was not just to receive money, but to receive it promptly." *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 131-132 (N.Y. Ct. App. 2008). In determining the reasonableness of a contemplation of consequential damages under the circumstances, Michigan courts apply an objective standard of foreseeability. *Lawrence*, 445 Mich. at 12–13.

Plaintiff argues that, at the time the Policy was executed, the parties unquestionably contemplated that Plaintiff would sustain foreseeable lost rental income damages if Defendant breached the Policy. Plaintiff notes that the Policy expressly covered Plaintiff's "Commercial Property," and Defendant knew: (a) Plaintiff was a commercial landlord who rented the property to commercial tenants; and (b) the Policy listed the principal or anchor tenant occupying the building when the contract was executed as a "trade or vocational" school (*i.e.*, Specs Howard).

Plaintiff further argues that, as a matter of law, the parties unquestionably contemplated at that time that Defendant's failure to timely pay a covered loss claim

would foreseeably result in Plaintiff losing substantial rental income. That result transpired on May 22, 2020 when, after waiting over a year after the fire loss for Plaintiff to repair the building, Specs Howard informed Plaintiff it was terminating its lease and permanently relocating.  Specs Howard has affirmed that it moved because the Building remained unrepaired and essentially uninhabitable.

Plaintiff reasonably argues, as the Supreme Court held in *Lawrence*, a designation on the Policy that Building would be used for commercial purposes constitutes direct evidence that Defendant "reasonably knew or should have known that in the event of breach this plaintiff would lose profits." *Lawrence*, 445 Mich. at 14-15.  And, it is undisputed that the Policy not only insured the physical value of the Building but also expressly covered Plaintiff for lost business/rental income.

For these reasons, the Court concludes that Plaintiff is entitled to summary judgment with respect to the consequential damages of $511,613.55 that resulted from Defendant's failure to timely pay Plaintiff's business income loss.

Plaintiff also seeks the recovery of statutory interest with respect to all three of its claims. M.C.L. § 500.2006 requires insurers to pay 12% penalty interest on all claims not timely paid. This interest is intended to be punitive and is owed irrespective of whether the claim was reasonably in dispute. *Griswold Properties,*

*L.L.C. v. Lexington Ins. Co., 276 Mich. App. 551, 554 (2007).*  Payment is untimely if it is made more than 60 days after the insurer's receipt of satisfactory proof of loss.

Based on Defendant's claim representative's testimony, proof of Plaintiff's business income loss was received no later than June 12, 2019 and was never rejected.  Plaintiff asserts that penalty interest on Plaintiff's business income loss claim began to accrue 60 days later on August 12, 2019 and continued to accrue through the date payment was tendered on October 2, 2020, a total of 418 days. Pursuant to M.C.L. § 500.2006(4), penalty interest "must be paid in addition to and at the time of payment of the loss."  Plaintiff maintains that Defendant still owes Plaintiff $93,744.86 of accrued penalty interest on Plaintiff's business income loss.

Plaintiff contends that Defendant acknowledged receipt of proof of Plaintiff's building losses from the fire and water losses on June 24, 2019, so that penalty interest began to accrue 60 days later on August 24, 2019. With respect to Plaintiff's fire loss claim, Plaintiff states that there are 69 days of penalty interest or $3,709.44 due and owing on Defendant's untimely $163,520.72 partial building payment tendered on October 31, 2019 and $110,383.28 of penalty interest due and owing for Defendant untimely $826,960.68 final building payment tendered on October 2, 2020. Plaintiff argues that Defendant has failed to comply with its statutory obligation to pay the above liquidated penalty interest claim totaling $207,837.58.

The Court agrees and concludes that Defendant owes liquidated penalty interest totaling $207,837.58, as calculated above, plus Defendant will owe 12% penalty interest on the balance of the two water loss claims determined in this Order.

## V.    CONCLUSION

Accordingly,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment [ECF No. 21] is GRANTED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment [ECF No. 23] is DENIED.

IT IS FURTHER ORDERED that the parties shall submit to the Court, on or before June 26, 2023, a stipulated judgment consistent with the Court's rulings in this Order; Defendant does not waive any appeal rights by stipulating to the amount of the judgment consistent with this Order.


Date: June 9, 2023                          s/Denise Page Hood
                                            DENISE PAGE HOOD
                                            UNITED STATES DISTRICT JUDGE